## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

| | | |
|---|---|---|
| **ERIC JONES** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | **CASE NO.: 1:16-cv-02662 GLR** |
| **OFFICER JOSHUA JORDAN** *et al.* | : | |
| | : | |
| **Defendants.** | : | |

_____

**PLAINTIFF'S AMENDED MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

NOW COMES plaintiff, Eric Jones (hereinafter "Plaintiff"), by his attorneys, Emanuel M. Levin and Sharon Rhodes, pursuant to Fed. R. Civ. P. 56, files this Amended Memorandum in Opposition to Defendants' Motion for Summary Judgment (hereinafter "Opposition") and Cross-Motion for Partial Summary Judgment and states the following:

**I.     Introduction:**

On July 22, 2016, Plaintiff filed a Complaint against Officer Joshua Jordan (hereinafter "Jordan"), Officer Russell J. Tonks (hereinafter "Tonks"), Unknown Individual Officers, Unknown Individual Supervisors of the Baltimore Police Department, former Police Commissioner Anthony W. Batts, and the Baltimore Police Department (hereinafter "BPD").  The Complaint alleged violations of rights secured by the Fourth and Fourteenth Amendments to the United States Constitution via 42 U.S.C. § 1983, violations of Articles 24 and 26 of the Maryland Declaration of Rights, and Maryland common law torts of malicious prosecution, assault and battery, false imprisonment, and false arrest.

On October 25, 2016, Plaintiff filed an Amended Complaint which alleged nine counts against the aforementioned Defendants; Count One: Violation of Fourth and Fourteenth Amendments to the United States Constitution via 42 U.S.C. §1983 against Jordan and Tonks; Count Two: Violation of Fourth and Fourteenth Amendments to the United States Constitution via 42 U.S.C. §1983 against former Police Commissioner Anthony W. Batts, BPD, and Unknown Supervisors; Count III: Violation of Fourth and Fourteenth Amendments to the United States Constitution via 42 U.S.C. §1983 against Unknown Supervisors -Supervisor Liability; Count Four: Violation of Fourth and Fourteenth Amendments to the United States Constitution via 42 U.S.C. §1983 against Other Unknown Officer or Unknown Members (John Does) or Unknown Supervisors for Supervisors Bystander Liability; Count Five: Violation of the Maryland Declaration of Rights Articles 24 and 26 of the Maryland Constitution; Count Six: Malicious Prosecution against Jordan and Tonks; Count Seven: Assault and Battery against Jordan and Tonks; Count Eight: False Imprisonment against Jordan and Tonks; and Count Nine: False Arrest against Jordan and Tonks.

Thereafter, the court bifurcated the cause of action on (insert date here).  Per the bifurcation order, the case against Jordan and Tonks was allowed to proceed.  The case against former Police Commissioner Anthony W. Batts and BPD – and all other defendants under a municipal and/or supervisory liability cause of action – was stayed pending the results of the litigation against Jordan and Tonks.  Subsequently, the court entered a scheduling order in the litigation against Jordan and Tonks.  *See* ECF No. 46.  Pursuant to the scheduling order, dispositive motions were due on or before December 14, 2018.  Jordan and Tonks filed their motions for summary judgment on December 14, 2018.  Pursuant to L. R. 105(2)(c) and this court's order dated December 18, 2018, Plaintiff's Opposition to

2

Jordan and Tonk's Motion for Summary Judgment and Plaintiff's Cross-Motion for Summary Judgment is due January 7, 2019.  Accordingly, Plaintiff now files his Opposition to Jordan and Tonks Motion for Summary Judgment and Cross-Motion for Summary Judgment.

**ALTHOUGH THE PLAINTIFF ATTEMPTED TO FILE TIMELY, THE INCORRECT EVENT WAS SELECTED AND THE FILING WAS REJECTED.  WHEN HE WAS ALERTED TO THE DIFFICULTY,  HE DID CORRECT SOME TYPOGRAPHICAL ERRORS AND ADD SOME SUPPORTING LANGUAGE, REDACTED SOME IDENTIFIERS IN THE EXHIBIT AND TO NOTE THE CHANGES MARKED THIS DOCUMENT AS AMENDED.**  He respectfully requests this Court to accept the late filing as timely.

**II.     Plaintiff's Material Statement of Facts:**

On August 17, 2014, at least two citizens called 911 to report that drugs (hereinafter "CDS") were being sold and purchased on Patton Avenue. *See* Exhibit I- (Audio 389920-23); *see also* Exhibit # J – Transcript of Audios.  The call to operator 1316 stated that "they have a whole lot of people buying drugs." *See* Exhibit I - (Audio 389920).  The caller stated that there were 40 people purchasing drugs at the location "across from the church" and alley.  *Id.*  The caller gave a description of the drug dealer as "one guy, he had on all black, he's sitting on [a] porch … on one of those abandoned houses."  *Id.*   The caller further stated that the alleged drug dealer had on "capris shorts, all black, black tee shirt" and that he was a "Black male with a black hat on."  *Id.*

The call to operator 1313 stated that "some drug traffic going … on [in] the 3400 Block of Patton Avenue (and/or Peyton Avenue.) *Id.* at (Audio 389921).  The caller stated that a girl was allowing the drug dealer sell CDS in front of her house – 3407 Patton Avenue (and/or Peyton Avenue) –

because the drug dealers were allegedly paying the girl.  *Id.*  The caller further stated that "a guy in all black with a black hat was standing" outside the location all day and she described the location – 3407 Patton Avenue (and/or Peyton Avenue) - as being off the "5200 Block of Park Heights" Avenue in Baltimore City, Maryland.  *Id.* at (Audios 389922, 23). [1]

Jordan after hearing the recordings at the deposition declares them "anonymous".   (Jordan Depo P.184 L. 9-11) *See* Exhibit D.

Thereafter, Jordan and/or Tonks received a call from dispatch (hereinafter "KGA") to respond to "narcotics outside of 3317 Patton Avenue." *Id.* at (Audio 389924).  KGA stated that "people selling drugs at the location, number one male wearing all black and a black hat" was the dealer. *Id.*  Jordan (Unit 33) acknowledged the call and responded. *Id.*  Additionally, Tonks (Unit 34) acknowledged the call as well and responded to meet 33 at 3317 Patton Avenue. *Id.* at (Audio 389925).  KGA repeated the call was for "a number one male wearing all black, black hat, selling drugs, nothing further." *Id.*  Subsequently, immediately after KGA gave the aforementioned description, Jordan and/or Tonks stated, "10-4, I'm in the block, it's probably 30-40 people in this block on Denmore." *Id.*  Jordan and/or Tonks then stated "he's running right now, which way did he run?" *Id.*  Jordan and/or Tonks responded, "somewhere in this back alley, I can't find him." *Id.* at (Audio 389926).  Jordon and/or Tonks, after being asked for a description of the person just seen in the alley, stated "black tee shirt, black shorts, black hat, thin build, I couldn't tell." *Id.*  Jordan and/or Tonks stated next, "I am going on Denmore." *Id.* at (Audio 389928).

---

[1] Defendant Jordan affirmatively stated that police officers never hear 911 calls. Therefore these calls could not help establish reasonable articulable suspicion.  (Jordan Depo at P. 184 L. 9-20).

On the same date at approximately the same time Jordan and Tonks were in pursuit of the suspected drug dealer wearing all black, Plaintiff was "a lawful pedestrian walking on the sidewalks of Baltimore City, Maryland." *See* Exhibit  B-Plaintiff's Affidavit; *see also* Exhibit D- Plaintiff's Deposition at 151-59 (Plaintiff confirmed his signature on the Affidavit and that the facts of the August 17, 2014 arrest in the Affidavit were from his memory and recollection of events).  He had been staying at the Denmore Apartment complex.  *See* Exhibit B-Plaintiff's Affidavit; *see also* Exhibit D-Plaintiff's Deposition at 43 ¶¶16-22 (By inference, Plaintiff states that he left the Denmore apartment of Ms. Karen Hall).  Sometime prior to 3:00 pm, Plaintiff left the apartment he was staying at to go to a local store on Park Heights Avenue.  *See* Exhibit  B-Plaintiff's Affidavit; *see also* Exhibit D-Plaintiff's Deposition at 168 ¶¶16-19.  He was wearing a brown colored striped shirt over another brown shirt and brown pants. *See* Exhibit B-Plaintiff's Affidavit. He was not wearing any black clothing.  *Id.*  He was not the suspected drug dealer. Jordan and Tonks had finished pursuing.  *Id.*

After completing his transaction, Plaintiff left the store at approximately 3:00 pm to head to Pimlico Race Track. *See* Exhibit B-Plaintiff's Affidavit; *see also* Exhibit D- Plaintiff's Deposition at 168 ¶¶16-19    While in route, he met a friend on the way.  *See* Exhibit B-Plaintiff's Affidavit.  As the Plaintiff and his friend were walking to Pimlico Race Track, a police car pulled behind them.  *See* Exhibit B-Plaintiff's Affidavit; *see also* Exhibit D- Plaintiff's Deposition at 179 ¶¶1-3; 184 ¶¶10-22. Jordan and Tonks exited the police car and ordered Plaintiff and his friend to stop.  *See* Exhibit  B-Plaintiff's Affidavit; *see also* Exhibit D- Plaintiff's Deposition at 179 ¶¶4-8.  In fact, Plaintiff and his friend were ordered to the ground.  *See* Exhibit B-Plaintiff's Affidavit; *see also* Exhibit D- Plaintiff's Deposition at 209-210.  Plaintiff and his friend complied with the order to get on the ground.  *See*

Exhibit B-Plaintiff's Affidavit; Exhibit D-Plaintiff's Deposition at 191 ¶¶7-15.  While on the ground, Jordan and Tonks asked Plaintiff about identification. *See* Exhibit B-Plaintiff's Affidavit; *see also* Exhibit D- Plaintiff's Deposition at 182 ¶¶21-22, 183.  Believing he had done nothing wrong to warrant being stopped, Plaintiff "got up and started walking away."  *See* Exhibit  B-Plaintiff's Affidavit; *see also* Exhibit D- Plaintiff's Deposition at 181 ¶¶6-11; 194 ¶¶8-22 (Plaintiff testified that he was not engaged in any criminal activity.)  At no point did Plaintiff run. *See* Exhibit B-Plaintiff's Affidavit.  Further, at no point did Plaintiff run and discard anything, including a cigarette package.  *Id* at 21.  Despite having no contraband and/or drugs on Plaintiff's person, Jordan and/or Tonks subsequently tackled Plaintiff head first to the street. *Id* at 16, 21; *see also* Exhibit D-Plaintiff's Deposition at 179 ¶¶13-18; 182 ¶¶18-20; 192 ¶¶13-22.  (Plaintiff testified that he never purchased drugs from the area he was arrested and that he recalled Jordan and Tonks tackling him face first to the ground.).  Plaintiff's head hit the concrete curb.  *See* Exhibit B-Plaintiff's Affidavit at 17.

While on the ground, Plaintiff recalled being hit a second time with a hard object – possibly an officer's ASP baton - or fist.  *Id* at 18; *see also* Exhibit D- Plaintiff's Deposition at 201 ¶¶3-4, 18-19. Plaintiff never attempted to resist arrest or strike any police officer.  *See* Exhibit  B-Plaintiff's Affidavit at 22.  Plaintiff is arrested at Hayward Ave and Florence Street (5200 Block of Florence) at approximately 3:20pm ("1520 hours").  *See* Exhibit I - (Audio 389929).

At some point after being tackled to the concrete pavement and/or curb and arrested by Jordan and Tonks, Plaintiff lost consciousness.  *See* Exhibit  B-Plaintiff's Affidavit  at 19.  Plaintiff recalls regaining consciousness in the hospital while handcuffed to a hospital bed.  *Id.* at 23-24.  While at the hospital, Plaintiff was admitted with life threatening injuries as a Delta Code (serious trauma) patient for

five days at Sinai Hospital – August 17, 2014 through August 21, 2014.  *See* Exhibit *See* Exhibit M

Sinai Hospital Admission and Discharge.  On August 19, 2014, Plaintiff was placed under general

anesthesia and underwent brain surgery.  *See* Exhibit  *See* Exhibit M  Sinai Hospital Admission and

Discharge.  He was diagnosed with (1) Traumatic brain injury; (2) Bilateral left and right subdural

hematomas; (3) Traumatic subarachnoid hemorrhage along the left cerebral convexity; (4) Small right

anterior frontal lobe hemorrhagic contusions; and (5) Mild  right acromioclavicular subluxation. *See*

Exhibit M  Sinai Hospital Admission and Discharge.  Plaintiff was diagnosed with permanent brain

injury resulting in lifetime cognitive disabilities.  See Exhibit L IME Report from Dr. Naff.  He was

given Keppra 500 for seizure prophylaxis, placed in a Miami-J cervical collar and transferred to surgical

intensive care.   *See* Exhibit M Sinai Discharge.  Plaintiff was also diagnosed with back pain, headache,

multiple facial abrasions, ecchymosis, and abrasion to the right shoulder and left posterior shoulder, and

confusion. *See* Exhibit M Sinai Admission and Discharge - Plaintiff's Deposition at 58 ¶¶15-22.  He

was placed in sling for the right acromioclavicular separation.   *See* Exhibit M Sinai Admission and

Discharge.  It was noted he had an abrasion over the right zygoma. Exhibit M Sinai Admission and

Discharge.

  After being discharged from the hospital, Plaintiff was charged with seven crimes. *Id.* at 31.  He

was charged with (1) CDS: Poss-Marijuana; (2) CDS: Poss marijuana L/T 10 G; (3)Assault in the

Second Degree; (4) Resisting and or Interfere with Arrest; (5) CDS: Poss Paraphernalia; (6) CDS: Poss

w/int to Distribute; and (7) CDS: Possess-Not marijuana.  *See* Exhibit N Trial Transcript and Exhibit O

Maryland Judiciary Case Search Docket Report for that matter.**.**  He was incarcerated for approximately

thirty days. *See* Exhibit O Maryland Judiciary Case Search Docket Report for that matter. On September

29, 2014, Plaintiff was acquitted of all charges in the District Court of Maryland for Baltimore City.  *See* Exhibit Exhibit N Trial Transcript and Exhibit O Maryland Judiciary Case Search Docket Report for that matter.

Additional Facts will be provided in the Argument Section as Needed.

### III.  Material Facts in Dispute:

The Plaintiff denies being part of any crowd.  His affidavit states he was lawfully walking the street and not committing any criminal act.  Exhibit B ¶ 11.  At his deposition taken on September 13, 2018 when asked by his counsel, "Sir, did there ever come a time when the - -  you were around a crowd of individuals?" his response was "No, I never saw a crowd." (Plaintiff's Deposition at P. 225 L. 1-3).

In fact, Defendants did not stop Plaintiff near the alleged crowd.  Their first written explanation of what occurred was Jordan's Application for Statement of Charges sworn under oath written later the same day he placed the Plaintiff in the hospital:

> "On August 17, 2014 at approximately 1513 hours Officer Tonks and Officer Jordan responded to the area of Denmore and Hayward Avenue for a report of heavy drug activity. Upon arrival both officers observed at least 30 - 40 individuals in the block and began to scatter upon police presence. Through training and experience these officers believed they had witnessed a drug transaction in process. Officer Tonks and Officer Jordan canvassed the area for a suspected "dealer" wearing all black. They observed two individuals walking out of the 5200 block of Denmore Avenue in a hurried manner. In an effort to gain some information into drug activity, officers exited their vehicles to conduct a field interview  in the 3500 block of Hayward Avenue."  Exhibit A.

As this document states Tonks and Jordan saw 30 -40 people scatter and then they canvassed the area for the suspected "dealer."   It was sometime and distance later that they approached the Plaintiff and the person with whom he was walking to "gain some information into drug activity" and to conduct a field interview.  There is no connection between the two events as written.

The Defendants do not even stop near the crowd.  When reviewing the events, Officer Jordan

states: Defendant Jordan acknowledges that he was coming down Haywood and did not get to Paton, the

actual location for the call.

> **Q. Where were you coming from?**
> A. Hayward.
> **Q. So you're coming from Hayward. Where would the people be?**
> A. To my right. If I'm driving straight down here and don't make the turn.
> **Q. Did you ever arrive at the building that was -- I'm saying --**
> A. Did I ever go to Paton is what you're asking?
> **Q. Yes, sir**.
> A. No, I don't recall Paton being in the description.
> ( Jordan Depo P. 178 L. 4-15)Exhibit D

From that point the Defendants begin a wide ranging chase of the alleged "dealer" dressed all in

black.   Instead of his attempts to comport his statements with those of Defendant Tonks that upon

arrival they immediately dealt with Plaintiff leaving a dispersing crowd as that was the reason for the

radio call, Jordan is forced to acknowledge that the radio calls were very specific as to a location, not a

crowd, but with a "dealer" dressed all in black.

 Defendant Jordan or Tonks did not observe the Plaintiff do any illegal act nor did they see any

party perform any illegal act in their presence before they stopped and detained the Plaintiff. [2]      The

---

[2]During discovery, demand was made on the Defendants to produce impeachment evidence.  The
request was heard before Magistrate Mark J. Coulson on October 11, 2018.  The Defendants argued that
they did not have to provide impeachment documents.  Plaintiff's counsel, presented Judge Charles B.
Day's decision in *Newsome v. Penske Truck Leasing Corporation*, 8:04-cv-01024-CBD.  Defendants'
Counsel argued that it only applied to impeachment of substantive  matters. Plaintiff's counsel advised
the Court that he understood that Defendants position from their statements were that they had evidence
that would prove that the Plaintiff bought or sold controlled dangerous substances on the date of the
injury.  When questioned about same, Defense counsel stipulated in open court that they did not have
such any substantive impeachment documents so they should not be required to produce same. As a
result the order reflects that they do not have to provide impeachment documents to be used solely for
impeachment. (ECF Document 82). It is Plaintiff's contention that it is now duplicitous for Defendants
to attempt to infer to this Court that evidence exists that the Plaintiff was engaged in illegal acts as part

Defendants did not observe any criminal behavior of any kind.   Jordan admits that the Defendants had

not witnessed any CDS transaction.  There were no transactions of any kind seen.  ( Jordan Depo P. 49

L. 11-21).  Tonks corroborated with  a similar admission, "Q Had you seen any drug transaction? A

Physically hand-to-hand, no."  (Tonks Depo P. 73 L. 15-16).  Tonks did not see anyone, including the

Plaintiff transfer anything specific or non specific. (Tonks Depo P. 76 L. 20- P. 77L. 19).  Defendants

did not even know which specific drug that they were investigating ( Jordan Depo P. 51 L.18-51),

Jordan also did not see anyone in the group transfer anything to anyone else (Jordan Depo P. 52 L. 20-

P.53 L. 2).

Defendants came upon the Plaintiff Jones and another person walking with him and immediately

got out of their marked vehicle or vehicles ordering him to the ground.

At the time of the ordering Mr. Jones to the ground in the Defendants mind he was no longer free

to leave and that the Defendants had formally stopped and detained him.

Plaintiff was not the person who was described as wearing all black and distributed drugs at the

location of 3317 Paton Street.

Defendants Tonks and Jordan base their entire right to stop the Plaintiff on two factors that there

was a crowd in a high crime area from which they assumed criminal activity occurred and that they

immediately stopped the Plaintiff hurriedly leaving that crowd in unprovoked flight due to their

appearance.

Defendants' confusion as to the reason for their presence can only be intentional as  Tonks and

Jordan know that if they admit they were sent to secure a specific dealer they will have to explain why

of a crowd in this pleading when they acknowledged that no actual corroborative documentation exists
and stipulated to same.

they are going after Plaintiff who was doing nothing to attract their attention rather than the person they were sent to investigate.

Based on the radio calls where Jordan recognizes his own voice, he advises that they actually locate the alleged man in black they were sent to observe. Although earlier Defendant Jordan's repeated statements indicate that there was never a time that they actually saw the alleged drug dealer, those statements are not only disputed but patently false.

In fact, in their chase of him, they refer to him as "Curbie." Defendants state on their radio calls that he is running right now and one of them asked the other "Which way did he run man?" (audio 389925). Jordan finally admits that despite his memory the tape indicates that they do not stop but are canvassing for the "man in black." (Jordan Depo P. 97 l. 11-P. 99 L. 21). When confronted with the radio call advising that he did something different from he stated earlier and was asked which was more reliable, the tape with his voice on it or his memory he stated "Most likely the tape." ( Jordan Depo P 200 L 1-5, Exhibit D.

The Defendants lose sight of the crowd when they chase the "man in black" up a variety of roads and actually drive up and down to locate him. It appears that the Defendants are driving their cars against traffic into the area. The audio calls reveal that they end up in a back alley, chasing and again describing "Curbie" who "has black tee shirt, black shorts, black hat, he can't tell, thin build" and he reports that he is on Florence Avenue (audio 389926). Exhibit I and J.

The Defendants acknowledge that there was no basis to arrest. .Defendant Tonks admitted that there was no basis to arrest, "I don't believe we had probably cause to make an arrest at that point. We had nothing yet. " (Tonks Depo at P. 77 L 10-11). However, this was an arrest, not a field investigation

11

as the very next thing admitted was that the two individuals were ordered to sit on the curb. ( Tonks

Depo P. 79 L. 13-17).  Exhibit E.

Plaintiff is not stopped near the reported location of the alleged crowd was supposedly in a field

in the 5200 block of Denmore.  The only field on the map on Denmore is in front of its intersection with

Patton Avenue.

> **Q. Where were the people standing?**
> A. In the middle of 5200 Denmore near the field.
> (Deposition of Officer Joshua Jordan P. 177 L.19-21)

Another fifteen seconds and the Defendants appear to be traveling up another street altogether.

Their radio calls advise each other of their position and confirm that they are going up another street,

"going up Elmer" (audio 389928).    Although they may claim to be walking, there can be little doubt

that they are driving as the locations change so quickly.

It should be noted that Florence Avenue and Elmer Avenue are streets which meander and which

do not directly connect with Paton Avenue.  Each street another turn away from the initial address

which they advised was the location of the drug sale and where the crowd of thirty or forty people was

near and who allegedly dissipated at their approach.  Once again, the longer they travel, the more time

that dissipates, the less immediate their potential view of the Plaintiff.

Two minutes later at 3:20, the Defendants state that they are at the 5200 block of Florence

Avenue.  Three minutes from their arrival, at least two and a half winding blocks from their initial

location, they are apparently still attempting to stop someone (audio 389929).

Despite Defendants statements that this happened immediately, another five minutes go by until

at 3:25 p.m. the Defendants now report they are chasing someone new  and their location is reported as

Haywood and Florence Avenue (audio 389930). This is not Hayward and Denmore as initially stated nor Denmore and Patton Avenue where they advised a group of individuals had gathered nor 3317 Paton where the alleged "dealer" was operating.

After all of the above rapid movements up and down the area, silence reigns for nine minutes, until, at 3:34 p.m.. At that point the Defendants report that they are at the same location of Haywood and Florence and now ask for a 1018 (ambulance) stating that they have a fifty year old male with facial abrasions (audio 389931). No interim call was made regarding the take down, or any subsequent acts by the injured man. That injured man is the Plaintiff. (Jordan's Depo P. 185 L18 - P.210 L 10. ) . xhibit D.

Therefore it is strongly disputed that Plaintiff is anywhere near the location of the crowd on the Officers were called to find the alleged "dealer" 3317 Paton Avenue.

Looking at a map of the area, ( Exhibit H) it is clear that the Plaintiff was no where near the alleged crowd or the location of the call.

Dr. Christopher Chapman, Plaintiff's police expert  (Chapman Depo P. 157 L. 10-158 L. 4. ) Exhibit E, states the dispute concisely,

> "Here, the reason I said that it's increased is that Officer Jordan indicated that there was no reasonable suspicion or probable cause that Mr. Jones was engaged in any criminal activity. He indicated that; one, that the person -- that he was called to a different location, the black male dressed in all black. He chased that person, that person got away and that he subsequent -- and which is also important that in the previous hypothetical, was that -- you know, I interpreted the hypothetical that Mr. Jones was part of that group. But based on Officer Jordan and Officer Tonks, Mr. Jones was not part of that group of 30 to 40 black people that were in the area all selling and buying drugs. He was in a different location. And that the only reason that Officer Jordan stopped him wasn't in support of investigating his involvement in criminal activity, it was to determine whether or not Mr. Jones was going to be a conscientious citizen and may have had information about the person that ran away. So there was no -- there was no reasonable suspicion

13

to believe that Mr. Jones was involved in any criminal activity, when accepting what Officer Tonks and Officer Jordan says as being true."

The Defendants police expert Charles J. Key acknowledged that this matter has disputed facts and that if the trier of fact is persuaded to accept the Plaintiff's version, the Defendants breached the Plaintiff's civil rights.

Q. Did you at any time assume that Mr. Jones was credible in his statements that he was not part of any group?

A. I read his statements. I don't -- and it's not my role to decide credibility. And so in that case, if Mr. Jones were not part of that group, if Mr. Jones had done absolutely nothing, if Mr. Jones was coming or going towards Preakness, if all of the things Mr. Jones said are found by the trier of fact to be credible, and I were asked, well, if Mr. Jones actually wasn't part of that group -- and I'll give you an example, one of the questions you asked me, you know, officers plant drugs on police officers. If the officers --

Q. Do officers plant drugs on individuals?
**A. Pardon me?**
Q. Do officers plant drugs on individuals?
**A. Yes.**
Q. Yes.
A. And if all of that is the case, then the stop, the planting of drugs, is not only illegal -- *I mean, not only unconstitutional, it's criminally unconstitutional.*  (Emphasis Added) (Deposition of Charles J. Key P. 210 L. 18- 204 L. 2).  (See Exhibit G)

Mr. Key, was also asked to view Defendant Tonks situation assuming that the Plaintiffs' version of the encounter was accepted by the trier of fact that  Mr. Jones was not part of the group seen by the police.

Q. When you were asked questions by Mr. Duke regarding Mr. Tonks or Officer Tonks and Officer Jordan, you were basing it on your final opinion that they had not breached any of Mr. Jones's Fourth Amendment rights, and did not criminally plant drugs on him. Assuming the opposite of that, that he -- would you agree that Officer Tonks was also responsible just as much as Officer Jordan for being involved in that issue?

MR. DUKE: Objection.

A. Being involved in the issue if, in fact, drugs were planted; if, in fact, Tonks was aware of that; if, in fact, there was that the officers did not know that he was coming from the group; if, in fact, the trier of fact would agree or would find that Mr. Jones's account was credible and all of the things he said was credible, I would agree that Tonks would be involved in an unconstitutional criminal act. . . .

Q. Well, let's go back to that. There is a part of the deposition where Officer Tonks suggests that he is not sure if he put the handcuffs on Mr. Jordan -- I mean, Mr. Jones. If he was in any way involved with seizing or handcuffing him, would that change your opinion?

A. Doesn't change my opinion about the **takedown, because that's a separate act. Using --**by the way, use of handcuffs, now, can be considered -- that's another point, under 1115, a reportable use of force unless there is anything other than an absolute submission to being handcuffed. If Tonks put handcuffs on an individual that Tonks knew had not committed a crime, knew had been constitutionally - - **inappropriately, unconstitutionally seized, then** putting handcuffs on that individual would also  constitute an unconstitutional act. . . .  "

As a result, applying the appropriate standards, Defendants are not entitled to any relief they

seek in this matter.

## IV.  Material Facts not in Dispute for the purposes of Eric Jones's Cross Motion for Partial Summary Judgment:

The Plaintiff was a pedestrian walking on the street. Neither Defendant saw him preform any

criminal act or be part of any criminal behavior.  He was not running. According to the Defendants,

Plaintiff was walking toward them and was initially compliant.  He did not have an open warrant or a

gun nor did he appear to be a threat to them.  They did not stop him for the purpose of an investigation.

They did not know what to investigate.  They did not see any drugs being sold or possessed,  did not

know what drugs, if any, were being sold and never saw any ground stash or drugs that day.

When they stopped the Plaintiff, he was not part of any dissolving crowd, it had, if one chooses

to believe the Defendants already dissolved.  He was not in a vehicle or performing any improper or

criminal act.  He was also not in an area that was described by the Defendants as a high crime or open drug market since he was not on Patton and Denmore but on Florence and Haywood.

If  all the facts as stated remain in Dispute, even if Defendants facts were not disputed, Eric Jones is still entitled to Partial Summary Judgment because Defendants lacked reasonable articulable suspicion to stop and order him to the ground or detain him as a matter of law.

**V.  Standard of Review**:

If there is "no genuine issue as to any material fact . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56©. Summary judgment is "not a disfavored procedural shortcut, but rather [is] an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)(quoting Rule 1 of the Federal Rules of Civil Procedure).

A movant seeking summary judgment has the initial burden of identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with any affidavits, which it believes demonstrate the absence of any genuine issues of material fact.

Once that burden has been met, the non-moving party must respond by presenting cognizable evidence sufficient to establish genuine issues of dispute as to the *material* facts in the case. The non-movant's failure to present "affirmative evidence" in this regard is fatal to its position. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 257-58 (1986). Speculation, conclusory allegations, and the non-movant's denials are insufficient to raise genuine issues of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). Application of

Rule 56© does not demand that there be no disputes of fact of any kind. As the Supreme Court noted in *Anderson, supra*, "the mere existence of *some* alleged factual disputes between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." 477 U.S., at 247-48 (emphasis in original). The pertinent question therefore, is whether the non-moving party's evidence "presents a sufficient disagreement to require a submission to the jury, or whether it is so one sided that [the moving party] must prevail as a matter of law" on an essential element of the case. *Anderson, supra*, 477 U.S., at 251.

In reviewing a motion for summary judgment, the Court is required to view any permissible inferences to be drawn from the underlying facts in a light most favorable to the nonmoving party. However, if after viewing the evidence in a light most favorable to the nonmoving party, the Court finds that the non-moving party has failed to make a showing sufficient to establish the existence of an element essential to its case, upon which it will bear the burden of proof at trial, the Court should render summary judgment against the party. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883-84 (1990). As Judge Winter instructed in *Bland v. Norfolk & S. R.R. Co.*, 406 F.2d 863, 866 (4th Cir. 1996):

The function of a motion for summary judgment is to "smoke out" evidence to see if there is any case, i.e. any genuine dispute as to any material fact, and it there is no case, to conserve judicial time and energy by avoiding an unnecessary trial and by providing speedy and efficient summary disposition. (quoted in *McNeiry v. McGraw Hill*, 919 F. Supp. 853 (D. Md. 1995)); *see also Fidelity v. Grave-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987).

A genuine dispute is one where the conflicting evidence creates "fair doubt." Wholly speculative claims cannot amount to fair doubt.

When reviewing the actual facts and considering the recognized standard to review them in favor of the non moving party, they support Plaintiff's claims. In this federal circuit, the Court is obligated to prevent factually unsupported claims from going to trial. *Drewitt v. Pratt*, 999 F.2d 774, 778 - 779 (4th Cir. 1993) (quoting *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987).

For the reasons to be explained, granting of summary judgment is not appropriate for the Defendants. However, reviewing simply the law the granting of a partial-summary judgment is appropriate for the Plaintiff.

## VI.  Argument in Opposition:

The Defendants received a call for service for drugs being sold on Patton Avenue.  They were advised concerning a specific inidividual who was dealing unnamed drugs. He was specifically described wearing all black.   No other party was specifically identified, particularly not Plaintiff.   The people gathered across from the church and in the alley may or may not have been involved in an improper act, but to assume so requires more than provided by the Defendants.  In essence it amounts to a mere hunch as there are no facts provided throughout the scenario of any crime being committed.

Plaintiff did not meet the description of the drug dealer called into by the civilian calling  911. Plaintiff did not meet description of the suspected drug dealer they were chasing.  Plaintiff was never observed on Patton Avenue as admitted by Tonks and Jordan.  Although Tonks and Jordan testified that Plaintiff was seen departing a crowd of people, Plaintiff disputes that testimony.  Plaintiff was stopped and arrested on Hayward Avenue and Florence, not the location where the call stated drugs were being

transferred nor the location of the crowd.  Moreover, Plaintiff testified that he walked away after being

asked for identification, Tonks and Jordan testified that Plaintiff ran away and discarded a package,

which Plaintiff denied.  Plaintiff was also acquitted of all charges when the Defendants prosecuted him.

Tonks and Jordan's Motion for Summary Judgment  must be denied because there is a genuine material

dispute of fact regarding multiple substantive issues that go to the heart of their issues.  The fact that the

Plaintiffs denies being part of a crowd and is detained streets and time later is recognized by their own

expert as a substantive issue which would cause the case to pivot in favor of the Plaintiff.

When considering the logistics of the location, the hurried approach, the chase of a third party

and the sudden determination to stop the Plaintiff, a reasonable trier of fact has to consider credibility to

determine which of these elements is accepted.  As a result, the matters are disputed and not ripe for

summary judgment. The Defendants simply are not entitled to the relief of a summary judgment in their

favor.

## VII.  Plaintiff's Cross -Motion for Summary Judgment

The argument is simply this: although the facts are disputed, Plaintiff is entitled to summary

judgment as to the first stop as a matter of law.  Even if the trier of fact finds Tonks and Jordan saw

Plaintiff  walking in a hurried fashion from a group of people, that fact, coupled with the KGA calls for

service Tonks and Jordan received is simply insufficient to establish the required Reasonable

Articulable Suspicion or Probable Cause without further observations and investigation.

The facts are straightforward.  There was a call for service came out for an unknown controlled

dangerous substance being sold at specific locations at 3317 Patton Avenue.  There was even a specific

description of the "dealer.  However, it was only his description that was given.  No one else's.  It is

19

uncontested that the Defendants did not have any description of alleged CDS purchasers.  Upon Tonks and Jordan's arrival to the area, they did not take the time to develop the required factual basis to establish reasonable articulable suspicion as they immediately gave chase to the suspected drug "dealer."  Plaintiff was not that person as admitted by them.  After losing sight of the alleged drug dealer in all black, Tonks and Jordan eventually did encountered Plaintiff at a location different from their call for service.  Other than allegedly seeing Plaintiff leave a crowd at a different location, which is disputed, all they say is that the Plaintiff did was walk in a hurriedly manner.  They admit they did not see Plaintiff sell or buy drugs.  Nevertheless, armed with no description of alleged drug buyers, Tonks and Jordan stopped Plaintiff and ordered him to the ground.   Once they did that, it is considered a seizure for Fourth Amendment purposes.

Assuming, against the standard to be applied,  the facts in the light suggested by the Defendants in this matter, they were not acting with either the lesser standard of  reasonable articulable suspicion or probable cause when they immediately stopped the Plaintiff.  In either event the Fourth Amendment prohibits unreasonable seizures of a person.  The Supreme Court restated the principal in *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed. 2d 690 (1991), that a person has been seized within for Forth Amendment purposes, if, in view of all the considering the circumstances, a reasonable person would have believed he was not free to leave.  One such factor, important in this case, is the presence of several officers.   Others factors are use of aggressive language or tone of voice indicating that officer's request is compulsory.  *Hatheway v. Thies*, 335 3d 1199 (10th Cir. 2003).

It is not necessary to go father as Tonks and Jordan admit that the Plaintiff was seized, as Defendant Jordan advised that he did not think that the Plaintiff was free to leave.

**Q. You told him to sit?**
A. We asked him.
**Q. You asked, so he didn't have to listen to you?**
A. I would say he's not free to leave at that time, no.
**Q. So he's detained?**
A. Yes.
**Q. And everything that comes out of your mouth at that time is an order, isn't it?**
A. Yes.(Jordan Depo, at P. 57 l.7-17).

Tonks and Jordan admit that Plaintiff was seized and was not free to leave.  Thus, despite not having a description of suspected buyers, despite being on a different street than the call for service, and despite not seeing Plaintiff engage in illegal conduct, Tonks and Jordan stopped and detained Plaintiff. As a matter of law, Tonks and Jordan lacked Reasonable Articulable Suspicion to stop Plaintiff and they certainly lacked probable cause to detain and/or arrest Plaintiff.

Defendants are not entitled to qualified immunity as they failed to follow the guidelines permitted Police Officers when investigating possible improper conduct.  They mistake a permissible field interview in which a party is free to not respond and is free to leave, which only requires reasonable articulable suspicion and a stop where they effectively detain someone and they are not free to leave.  In the latter they are required to have probable cause to so detain.  Defendants joint actions amounted to an immediate detention and arrest of the Plaintiff which effectively violated his civil and constitutional rights from the moment they began to order him to obey their instructions.

Contrary to law, the Defendants thought that they could detain and did not understand that was an arrest. "As far as after a few minutes of identifying them and talking to them with whatever they were willing to talk to us about, at that point further we had no other -- I guess no other plan past that. We would have to release them after a small period of time."  (Tonks Depo p. 78 L21 - P. 79 L. 5).

Defendants Motion for Summary Judgment rests entirely upon their allegation that they observed  Jones to be  part of a crowd of individuals who allegedly dispersed at the time of Defendants' initial approach. As can be seen when reviewing the actual facts discerned through discovery, this is insufficient for even reasonable articulable suspicion.

They are basing their actions on an anonymous tip.  That is insufficient standing alone.  In *Florida v. J.L.,* 529 U.S. 266 (2000), the United States Supreme Court examined the use of anonymous tips used by police officers. In the matter of *Florida v. J.L.*, supra., the police received an anonymous call that a black male, wearing a plaid shirt, and standing at a bus stop had a handgun in his pocket. An officer responded to the scene, and without any further corroboration, the officer reached into J.L.'s pocket and seized the gun. The Supreme Court held that an anonymous tip of this nature, that merely describes a subject in a particular location, does not satisfy the reasonable suspicion necessary to justify a frisk.

In *Florida v. J.L.*  Court distinguished, *Alabama v. White*, 496 U.S. 325 (1990), where the Court found that an anonymous tip that predicts future conduct that the police can corroborate before a stop will satisfy the reasonable suspicion standard. In White, the caller indicated that a woman named White would be leaving a specific address, at a specific time, in a specific vehicle, in possession of briefcase containing drugs. The caller further indicated that White would be going to a specific hotel with the drugs. The police took action to examine the accuracy of the tip,  conducted a surveillance of the location and observed White leave at the predicted time in the predicted vehicle. White drove toward the predicted hotel at which point she was stopped. The Court upheld the stop in this case after finding that

the anonymous tipster showed intimate knowledge of White by the caller's ability to predict White's future conduct.

Additional cases based on anonymous tips provide some guidance on this issue. In *Johnson v. Texas,* 146 S.W.3d 719 (Texas Ct. Appeals 6th Dist. Texarkarna 2004), a Texas appellate court examined an anonymous tip concerning narcotics sales. "The caller told police a black man, accompanied by two black females, driving a 1999 black Ford Taurus with a specified license plate number, was involved in possible drug activity at a specified apartment complex. The officer testified the apartment complex in question was known to be a place that regularly had "drug deals and drug activity" occurring." Based on this information the officer responded to the area and stopped Johnson's vehicle. Johnson was alone in the vehicle at the time of the stop.

In analyzing whether the officer had a sufficient basis to stop this vehicle,  the Texas  court took notice of the following points of logic applicable in this matter: "A mere anonymous tip, standing alone, does not constitute probable cause…An anonymous telephone call may justify the initiation of an investigation, but the court has held that, alone, it will rarely establish the level of suspicion to justify a detention…The corroboration of the details which do not indicate criminal activity will not lend support to the anonymous tip…Reasonable suspicion requires it [the anonymous tip] be reliable in its assertion of illegality, not just in its tendency to identify a determinate person…When more information is available, [that may be corroborated before the stop] however, a police officer may reasonably conclude the tip is reliable, thus justifying an investigatory detention." Similar to the case at bar, the officer in that case testified that the sole basis for the stop in this case was the call based on an anonymous tip from a citizen he never heard  coupled with the officer's knowledge of the area. The court, in rejecting the

validity of the stop concluded that the officer had no information which provided corroboration that Johnson was the fruit of the poisonous tree.

In the present matter, there was no corroborating evidence, nothing that would predict the Plaintiff's next movements, and nothing that described him at all.  Based on this guidance, the Defendants simply were acting on gut instinct and nothing more.

Under the Fourth Amendment, Police seizures are generally categorized as either full arrests or ones that are less intrusive detentions such as field investigations.  An arrest must be done with probable cause or they are constitutionally invalid.

The Defendants attempt to provide the basis for the stop, as discussed above, as deriving from reasonable articulable suspicion derived from just two facts,  Mr. Jones was fleeing from the police from a crowd and that they had the right to detain him for a Terry Stop.  They cite two cases. Based on their own authority, such cases do not support their contention.  The Defendant reliance on *Illinois v. Wardlow,* 528 U.S. 119 (2000); *and United States v. Scott*, 270 F.3d 30, 41(1st Cir. 2001) fails as such cases are factually distinguishable. As stated above there were no weapons of any kind found on Plaintiff and no suggestion that such existed, therefore a frisk or pat down permissible under Terry did not and would not have been appropriate.   Second, there were no open warrant on the Plaintiff and he was at all times pertinent to this matter a pedestrian therefore, *United States v. Scott*, supra, was a matter which discusses a car search  in which the forger with open warrants was being chased directly from complaints regarding his attempts to pass a bad check places that matter far afield from the facts in this matter.   The Defendants also improperly rely on *Sizer v. State*, 456 Md. 350 (2017).  The the Court of Appeals of Maryland did not rely on flight in  Sizer v. State. They reviewed the totality of the

circumstances.  The Court explained there were two crimes committed in the arresting officers presence. *Sizer v. State*, at 174 A.3d 339.  That court did not even consider whether there was a high crime area to reach its decision.  The Court suggested that the flight caused the police to focus on Sizer as the party who may have thrown the offending bottle.  As the Defendants in this mater did not observe any criminal behavior they cannot use that allegation to buttress their position.

A second point to consider is whether the area where Plaintiff was stopped should even be considered as pertinent.  Defendants argument for  stopping Plaintiff is allegedly based on the fact that Defendants thought there was an "open air drug market". When Defendant Jordan was confronted with defining such an area, he indicated that it would be a place where one would see drugs being sold openly.  Then he testified that he did not see any drugs sold openly.  As no drugs were collected on any person before the arrest of the Plaintiff and no ground stashes were found, the location fails to meet his definition and should not be considered as such in a review of the totality of the circumstances.  (Jordan Depo P. 57 L.1- P 59 L 18).  As a result, notwithstanding his experience, pursuant to his own definition, there was no "open air" drug market.

Furthermore, after reviewing the recordings, the location of the crowd, was not where the Plaintiff was stopped.  The crowd had allegedly gathered  near 3317 Paton Avenue but the Plaintiff was stopped two or more blocks away at Florence Avenue and Hayward Avenue.

Since the Defendants did not stop the Plaintiff where the crowd might have been, they should not be allowed to suggest that they can use their  experience that it is an area where daily drug activity takes place.  Neither Defendant testified that the location that Plaintiff was stopped was considered a "high crime" area.

Merely being in a high crime area is insufficient to establish any basis to detain an individual. "An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime. *Brown v. Texas*, 443 U. S. 47 (1979)."  Cited with authority in *Wardlow v. Illinois* 528 U.S.119.

A third point to consider is the issue of flight, the Defendants rely on *Illinois v. Wardlow*, 528 U.S. 119 (2000) to suggest the Plaintiff's alleged unprovoked flight was a factor to be considered. However, as discussed above, Defendants statements that Plaintiff was viewed immediately leaving a crowd in a hurried manner when they stopped him are blatant falsehoods.

Even when considering their own statements in the light most favorable to them, both Defendants indicated that Mr. Jones was walking to or by their marked vehicles.  It is totally inconsistent with unprovoked flight from the Police when Plaintiff was detained while  walking towards the police.  In addition, the Officers both suggest that Plaintiff was initially compliant to their orders, therefore diluting any suggestion that his intention was flight.  Finally, and importantly, Plaintiff in his affidavit denies any flight even after being stopped.  (See attached Affidavit as Exhibit B)

Therefore, there is actually no undisputed position regarding articulable suspicion or probable cause to allow the Defendants to detain or seize the Plaintiff as they did in this matter.

Plaintiff based on the undisputed facts in this matter should be entitled to a partial summary judgment that the initial stop and detention violated his civil rights and was an unlawful arrest and detention.

**VIII.  Defendants Tonks and Jordan Acted Jointly in this Matter**.

Defendants allege that Defendant Tonks should be treated differently than Defendant Jordan.   In that attempt, they do not recall their own admissions against interest.   Tonks, despite being the senior Officer made an agreement with Jordan after the incident. Defendant Jordan was selected to be the arresting Officer (Tonks Depo P. 63 L5-16). He admitted that the two individuals were ordered to sit on the curb. ( Tonks Depo P. 79 L. 13-17).   Jordan advises that Tonks was the one who ordered them to do so.  Tonks also explained that Jordan was the one who tackled Jones as "[H]e was able to catch up fairly quickly on Florence, and I observed him wrap him up from behind, *which I have seen him do in past foot chases*." emphasis added (Tonks Depo, P. 82 L 13- 18).   Coupling this statement with his earlier, "I don't know if we verbally communicated to each other or if it was just kind of a natural thing, one person grab the evidence, another person to pursue the individual.  (P. 82 L. 7-10)  Thus, verifying that the two consider themselves an arrest team who operate repeatedly in the same fashion supporting each others actions.

Tonks advised that he may have assisted in the arrest when he held on to the handcuffs restraining Plaintiff during the search.  ( Tonks Depo, P 155 L. 2-5). As a result of Plaintiff being stopped, Jordan states Tonks detained them by ordering them to sit on the curb.  Jordan states that Defendant Tonks began asking for ID and whether they had any contraband on them. It was admitted that the Defendants considered the stop a detention. (Jordan Depo P. 48 L. 7 P. 49 L. 10).   He also explained that he considered Defendant Tonks the senior officer who he would consider in charge even though he was "leading the way for this call".  (Jordan Depo P. 61 L. 1-6).  However, it is clear that the two officers are considered to be working in tandem and they know how "each other works".  (Jordan Depo P. 62 L. 17 - P. 62 L.4).

As they routinely chase down and tackle suspects together, the only difference here being the actual party who inflicted the damage on this occassion, the attempt to distinguish one from the other is not appropriate at this stage.  It is clear that the two enabled and assisted each other and as discussed above, their statements exculpating each other are as questionable as those statements intended to inculpate Jones.

## IX. Conclusion.

Due to the clear genuine disputes of facts the Defendants can never meet the level of scrutiny required for a favorable result pursuant to Rule 56 of the Federal Rules of Civil Procedure.  The Defendants only argument throughout their pleading is that the Defendants had the right to detain Plaintiff based on information that is palpably and transparently disputed.  As demonstrated these arguments are not supported by the Defendants own statements or the law.

However, on the Plaintiff's side of the issues, when considering the undisputed facts and adding the element of the radio calls recording the times and events of the moment there are no undisputed material facts that the Defendants had sufficient reasonable articulable suspicion to think that he committed any wrongdoing or activity that would have provided a basis for their detaining him.

It is the request of the Plaintiff that this Honorable Court find for the Plaintiff as to liability on the issues of violation of his fourth amendment rights, battery and false arrest and false imprisonment for at least the first stop and allow this matter to proceed to a hearing on damages for all of the Federal and State violations done to his civil rights.

_____/s/_____
Emanuel M. Levin

110 West Street
Suite 231
Towson, Maryland 21204
emlevinlaw@aol.com
Federal Bar ID No.: 00919
Telephone: (410) 727-1999
Facsimile: (410) 727-1224
Attorney for Plaintiff Eric Jones


_____/s/_____
Sharon L. Rhodes
110 West Street
Suite 231
Towson, Maryland 21204
Srhodeslevinlaw@aol.com
Federal Bar ID No.: 03929
Telephone: (410) 727-1999
Facsimile: (410) 727-1224
Attorneys for Plaintiff Eric Jones


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 7th day of January, 2019, a copy of **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT** was sent electronically via the Courts filing system:


All other Parties through their counsel,
Neil E. Duke, Esquire
Justin Daniel, Esquire
Baker, Donelson, Bearman, Caldwell & Berkowitz
100 Light St.

Baltimore, MD 21202
Email: nduke@bakerdonelson.com
        jdaniel@bakerdonelson.com
and

Michael Comeau, Esquire
Chief Solicitor
Federal Bar No. 01175
Michael.Comeau@Baltimorepolice.org

Kara K. Lynch, Esquire
Federal Bar No. 29351
Assistant City Solicitor

Email: kara.lynch@baltimorepolice.org

Brent Schubert, Esquire
Assistant City Solicitor
Federal Bar No. 19593
Email: Brent.Schubert@baltimorepolice.org